# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| v. : | CRIMINAL NO. 17-CR-00333 |
| CAROLYN CAVANESS : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its undersigned attorneys, hereby submits this sentencing memorandum.

**I.      LEGAL BACKGROUND**

The Third Circuit has set forth a three-step process for sentencing by district courts following *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006)). In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence.  "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it."  *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).  *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."); *United States v. Flores-Mejia*, -- F.3d --, 2014 WL 3450938, *2 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

Here, the sentence imposed must, most importantly, promote respect for the law and deter others who would destroy confidence in the integrity of the electoral process by committing similar offenses in pursuit of elected office and political power.  *See* 18 U.S.C. § 3553(a)(2).

## II.    BACKGROUND

On July 21, 2017, defendant Cavaness pleaded guilty to one count of violating 18 U.S.C. § 1001 (false statements).  During her plea colloquy, the defendant admitted to her participation with Jimmie Moore, Donald "D.A." Jones, and Kenneth Smukler in a criminal scheme with that circumvented federal campaign finance limits in an attempt to defeat transparency in the campaign finance process as administered by the Federal Election Commission ("FEC").

**Bob Brady for Congress Scheme**

In the 2012 Democratic primary election for Pennsylvania's First Congressional District, Jimmie Moore, a former Philadelphia Municipal Court Judge, ran against the incumbent, Robert Brady.  As the evidence at Smukler's trial proved, Moore struck a deal by which he agreed to withdraw from the race in exchange for funds from the Bob Brady for Congress campaign to be used to pay off Moore's campaign debts.  Those debts included money that Jimmie Moore for Congress (the "Moore campaign") owed to several vendors, to Moore himself, and to defendant Carolyn Cavaness, who was Moore's campaign manager.

On February 29, 2012, Moore withdrew from the race.  Moore and Cavaness subsequently prepared a list of debts owed by the Moore campaign.  Moore provided a copy of this list to the Smukler, and the two sides eventually agreed that the Moore campaign would receive $90,000 from the Brady campaign.  At a meeting to discuss the transfer of funds,Smukler told Moore that the $90,000 would be paid in three installments:  two payments from the defendant's company disguised as the purchase of a poll—a poll that the Brady campaign already possessed—and one from another Brady operative disguised as a payment for consulting work purportedly done by Cavaness (which never occurred).  Bank records showed three payments from the Brady campaign to Cavaness via the defendant and via Donald "D.A." Jones (a fellow political consultant who also worked on the Brady campaign ) in the months after Brady prevailed in the primary.  Evidence at trial established not only that Smukler met with Moore and directed the scheme, but also that he contacted Cavaness himself to arrange the payments and fraudulent invoicing to conceal the true nature of the payments.

**First Unlawful Campaign Contribution**

The first payment was a June 11, 2012, check in the amount of $40,000 from the Brady

campaign to Voter Link Data Systems ("VLDS"), a political consulting company run by Smukler.  On July 13, 2012, the Brady campaign filed a FEC report that stated this payment was an expenditure to VLDS for "Survey and Polling Services."   On June 13, 2012, two days after receiving the money, VLDS wrote a check to Cavaness in the amount of $40,000, which she deposited in her personal bank account.  The subject line of the check stated: "Poll."  The check was signed by Smukler.

Records showed that Cavaness used approximately half of these funds to repay Moore a portion of the money that Moore had lent his own campaign.  Between June 18, 2012, and July 7, 2012, Cavaness wrote several checks to Moore, totaling $19,500.  Each of these checks had the word "reimbursement" written in the subject line.  The rest of the funds from this first payment remained in Cavaness' personal bank account.

Evidence at trial established that Smukler, working with others, sought to disguise the first and second payments from the Brady campaign as the purchase of a poll to conceal the fact that Brady campaign funds had been used to pay his opponent's debts.  The poll at issue was commissioned by Moore a year earlier, in February 2011, to analyze the primary matchup between himself and Brady.  However, witnesses and corroborating documents established that the Brady campaign had already obtained the poll and the underlying data long before Smukler cooked up the scheme to have the campaign supposedly purchase them from Cavaness.  In other words, that purchase took place in June 2012, over a month after Brady won the primary, and over three months after Moore, the opponent that was the subject of the poll, withdrew from the race.  This meant that the poll was useless by the time the purchase scheme was enacted.  Moreover, the Brady campaign purportedly purchased this poll, which it already had, for more than twice the approximately $34,000 Moore originally paid for it in early 2011, at a time when

4

Moore was running and the information was actually relevant.

## Second Unlawful Campaign Contribution

On July 10, 2012, a month after the first payment, the Brady campaign wrote another check to VLDS, this one in the amount of $25,000. The Brady campaign filed an FEC report on October 15, 2012, stating that this second payment was an expenditure to VLDS for "Acquisition of Cross Tabs." On July 17, 2012, one week after receiving the money from the Brady campaign, VLDS wrote a check to Cavaness in the amount of $25,000, which she again deposited in her personal bank account. Smukler also signed this check.

Cavaness testified that she spent some of the VLDS money on personal expenses for herself and Moore. Cavaness also used $13,000 of that money to open a bank account for CavaSense and Associates ("CavaSense"). Evidence at trial showed that Smukler instructed Moore to create a shell company to receive the Brady campaign funds. As a result, and at Moore's direction, Cavaness created CavaSense in June 2012. Cavaness later used the funds in the CavaSense account to repay campaign vendors, including herself. The sole purpose of CavaSense was to serve as a cut-out to receive and conceal the Brady campaign funds funneled through the consulting companies run by the defendant and Jones.

Cavaness testified that Smukler told her to create an agreement and invoices for the "sale" of a poll to VLDS by CavaSense. Per Smukler's instructions, Cavaness created an agreement stating that CavaSense would sell the rights to the 2011 poll—which CavaSense did not own—to VLDS, as well as two invoices stating that VLDS would make two payments to CavaSense: $40,000 for the poll itself and $25,000 for the cross-tabs associated with the poll. The purpose of these documents was to create a fake justification for the transfer of funds from the Brady campaign, as discussed above.

### Third Unlawful Campaign Contribution

The third payment from the Brady campaign came on August 23, 2012, when the campaign wrote a $25,000 check to D.A. Jones and Associates, a political consulting company run by Jones. In its October 15, 2012, report filed with the FEC, the Brady campaign stated that this payment was an expenditure to D.A. Jones and Associates for: "Consultant." On August 30, 2012, one week after receiving the funds, D.A. Jones and Associates sent a $25,000 check to CavaSense, with the word "consulting" in the memo line. Jones signed this check.

Jones contacted Cavaness and directed her to create an invoice stating that D.A. Jones and Associates would pay CavaSense $25,000 for consulting services. Jones testified that Smukler directed him to make the payment to Cavaness, even though Jones knew very well that Cavaness had not done, and would never do, work justifying the payment. Cavaness testified that she never did any work for Jones or for the Brady campaign; rather, the purpose of the invoice was simply to further disguise the third payment.

Cavaness deposited this $25,000 check into the CavaSense account on September 4, 2012. On that same day, she wrote checks to several vendors who were owed money by the Moore campaign, and she also wrote two checks to her personal account.

### Summary of Conduct

Between June 2012 and August 2012, Smukler caused $90,000 to be transferred from the Brady campaign to Cavaness and her company for the benefit of the Moore campaign. Of that amount, $21,000 was used to pay vendors owed money from the Moore campaign, and $19,500 was paid to Moore in checks labeled as "reimbursement." Cavaness and Moore spent the remainder of the money on personal expenses.

To conceal the scheme, none of those payments of the Moore campaign debts were ever

reported on the campaign finance reports that the Moore campaign filed with the FEC after the primary election ended.  Those reports, which were filed in October 2012 and in June 2013, listed no payments on the debts to the vendors, to Cavaness, or to Moore.  Instead, the reports falsely listed the same debts that had appeared on earlier campaign finance reports, notwithstanding the fact that those debts had since been repaid with the funds from the Brady campaign.  Nor did the Moore campaign finance reports accurately reflect the receipt of funds from the Brady campaign, VLDS, or D.A. Jones and Associates.  Indeed, as noted above, the Brady campaign's FEC reports reflect only the payments to the defendant and Jones, with no reference to Moore, Cavaness, or CavaSense.

The evidence at Smukler's trial, including Cavaness's testimony, proved that Smukler and his co-conspirators sought to disguise the fact that the Brady campaign illegally used campaign funds to pay an opponent to withdraw from a race.  In so doing, Smukler not only caused unlawful, excessive campaign contributions, but also caused the two campaigns to file false reports with the FEC, and engaged in a falsification scheme with respect to administration of matters before the FEC, namely the collection and publication of accurate information about the Moore and Brady campaigns.

### III.   SENTENCING CALCULATION

#### A.   Statutory Maximum Sentence.

The maximum statutory sentence the Court may impose on the defendant for a violation of Title 18 United States Code, Section 1001 is five years imprisonment, a three year period of supervised release, $250,000 fine and a $100.00 special assessment.

B.  **Sentencing Guidelines Calculation.**

1.  **The USSG Guideline Range**

The defendant's advisory guideline range is calculated as follows. Pursuant to U.S.S.G. §2C1.8, the base offense level is 8. PSR ¶ 48. The value of the illegal transactions at issue was between $40,000 and $95,000, and therefore the offense level is increased by 6 levels pursuant to U.S.S.G. §§2C1.8(b)(1) and 2B1.1(b)(1)(D). PSR ¶ 49. She is entitled to a 2 level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. §§3E1.1(a). Her adjusted offense level is therefore 12 and her criminal history category is I, resulting in an advisory guideline range of 10 to 16 months.

## IV.  18 U.S.C. § 3553(a) FACTORS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) (quoting Freeman v. United States, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id*.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[1]

### A.     The Nature and Circumstances of the Offense.

Cavaness's participation in a campaign finance scheme struck a serious blow to the core goals of the federal campaign finance laws:  (1) fairness in elections conducted within universal limits (2) free of corrupt dealings.  It is these harms that Congress sought to prevent when it imposed contribution limits and reporting requirements.  The sentence imposed should reflect the seriousness of the violation, and counter the public cynicism that arises when insiders like Cavaness behave as though the rules do not apply to her or her candidates, or will not be enforced.  The voting public needs to know that the electoral process belongs to them, and not cynical and deliberately subversive political operatives.

### B.     The need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offenses.

While recognizing Cavaness's cooperation, this Court should impose a sentence that also reflects the seriousness of the criminal violations of the electoral processes.  Corruption of the

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (*quoting United States v. Navedo Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

electoral process and violation of the campaign contribution limits cannot be tolerated. The crimes committed here by an experienced political operative were blatant violations of the campaign contribution laws governing the 2012 congressional race. While our recommendation is tempered to reflect his acceptance of responsibility and valuable cooperation, Cavaness's conduct merits a punishment in proportion to the seriousness of her crime.

    **C.**    **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

The sentence imposed should deter others from embarking upon a similar path. The general public also needs to know that a conviction for corrupting the campaign finance process will be adequately punished.

    **D.**    **The guidelines and policy statements issued by the Sentencing Commission and the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

We are aware of no training needs for Cavaness. We see no guideline policy statements that call for a downward variance here based upon needs for educational or vocational training, or medical care.

    **E.**    **The need to avoid unwarranted sentence disparities.**

The most equitable way to avoid disparity and ensure that the defendant's sentence is arrived at by a fair and objective consideration is to calculate the advisory sentencing guideline range, and then apply a reduction in the advisory range warranted by Cavaness's substantial cooperation.

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Referring to the guidelines while carefully considering the 3553(a) factors particularly relevant to an individual defendant is the only

available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The Third Circuit explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of *Booker* that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, *helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.*" *Booker*, 543 U.S. at 264-65 (emphasis added). The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process through the Guidelines. *Id.* at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" *Cooper*, 437 F.3d at 331 (quoting *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

*United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original).

## V.     CONCLUSION

Criminal campaign finance schemes are an assault upon our democratic and electoral processes, and therefore warrant serious penalties. We recognize Cavaness's substantial assistance, and believe that she should be rewarded for her timely cooperation with a downward departure from the 10 to 16 months' incarceration called for under the sentencing guidelines. However, corruption of the electoral process destroys the public's trust in government and must be punished accordingly.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

s/ *Richard Barrett*
_____
RICHARD BARRET
Assistant United States Attorney
Chief, Corruption and Tax

s/ *Eric L. Gibson*
_____
ERIC L. GIBSON
Assistant United States Attorney

s/ *Richard Pilger*
_____
RICHARD PILGER
Director, Election Crimes Branch
REBECCA SCHUMAN
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice

# **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by me, this date, by email or electronic filing upon the following individual:

Anthony J. Petrone, Esquire
Attorney at Law
Three Logan Square
1717 Arch Street, Suite 3640
Philadelphia, PA 19103

Counsel for Carolyn Cavaness

_____
Eric L. Gibson
Assistant United States Attorney

Dated: December 5, 2019